Estate of George Lawrence, Deceased, Annie T. Lawrence and George Allen Lawrence, Executors v. Commissioner.
Estate of Lawrence v. Commissioner
Docket No. 110895.
United States Tax Court
1943 Tax Ct. Memo LEXIS 438; 1 T.C.M. (CCH) 646; T.C.M. (RIA) 43093; February 22, 1943
*438 R. R. Bullivant, Esq., Pacific Bldg., Portland, Ore., for the petitioner. E. A. Tonjes, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in the income tax liability of the decedent in the amount of $1,147.24 for the year 1937. The only question is whether a distribution of a corporation in the amount of $17,505, received by the decedent during the taxable year, constituted a taxable dividend. Respondent determined that the entire amount was out of earnings and profits of the corporation accumulated after February 28, 1913, and that, therefore, it was taxable under section 115 (a) of the Revenue Act of 1936. The return was filed with the collector of internal revenue for the district of Oregon. Findings of Fact Petitioners are the duly appointed and acting executors of the estate of George Lawrence, Jr., deceased. They reside in Portland, Oregon. George Lawrence, Jr., hereinafter called the decedent died in 1941. The George Lawrence Company, hereinafter called the company, was organized under the laws of Oregon in 1893. From that date through the taxable year, the company has carried on the business of manufacturing *439 and selling leather and leather products. The company was a family corporation, all of its stockholders being members of the Lawrence family. George Lawrence, Sr., dominated and managed the company until approximately the time of his death in December of 1922. Decedent and his brother, W. C. Lawrence, were active in carrying on the business of the company at all times. During the years 1913 to 1917, inclusive, the company had outstanding 500 shares of stock of $100 par value. This stock was held as follows: George Lawrence, Sr., 325 shares; decedent, 100 shares; W. C. Lawrence, 25 shares; and decedent's sisters, S.A. and M. H. Lawrence, 25 shares each. During the year 1926, the company declared a 400 percent capital stock dividend so as to increase the outstanding stock to 2500 shares of a $100 par value. During the year 1937, this stock was held as follows: Decedent, 875 1/4 shares; W.C., S.A., and M. H. Lawrence 531 1/4 shares each; and George A. Lawrence, 31 shares. Prior to the year 1913 and during the years 1913 to 1917, inclusive, the company followed the practice of computing the net profits for each year and crediting them to the "Loss and Gain Account," without making any *440 reserve for Federal taxes. The net profits so ascertained were then credited to individual accounts for each stockholder in proportion to his holdings of stock. The explanation given for these credits was "By Division of Profits for" the particular year. Formal directors' resolutions were passed early in January of each succeeding year declaring a dividend equal to the net profits so credited to each shareholders' account. Also, during the period 1913 to 1917, salaries, rentals, gifts from the father, George Lawrence, Sr., and other items were also credited to the individual stockholders' accounts. Various sums were transferred from the account of George Lawrence, Sr., to the individual accounts of members of the family. From time to time during each year, each of the shareholders drew against the balance of their individual account for their own personal purposes. As of December 31, 1912, the aggregate of the balance of the stockholders' accounts was $111,031.02, and at the end of 1917, was $269,046.24. In each year, 1913 to 1917, inclusive, the total credits in each year to all of the stockholders' accounts were as follows: Year
Amount
1913
$28,003.87
1914
19,075.46
1915
18,424.78
1916
80,090.50
1917
84,339.99
*441 At the end of each year the aggregate balances of the stockholders' accounts were: Year
Amount
1913
$130,229.67
1914
134,463.13
1915
143,901.25
1916
201,365.23
1917
[1] 269,494.97
A summary of the total credits to and withdrawals from the stockholders' accounts for the same period is as follows: Credits of
Credits of
Credits of
Credits of
Salary
Rent
Profits
Gifts
Withdrawals
Geo. Lawrence, Sr
$19,400
$33,600
$149,457.43
[2] $107,375.80
Geo. Lawrence, Jr
19,400
55
45,986.92
$ 8,300
44,926.54
W. C. Lawrence
19,400
55
11,496.75
9,300
[3] 37,304.15
M. H. Lawrence
11,496.75
8,300
7,072.35
S. A. Lawrence
11,496.75
8,300
10,138.46
Totals
$58,200
$33,710
$229,934.60
$34,200
$206,817.30
The above totals include credits of $5,000 for salary to each of the *442 male stockholders' accounts and $7,200 for rent to the father's account for the year 1917. The company from time to time borrowed money from banks to finance its operations. The company's credit was good. In the company's balance sheets for the years 1913 to 1917, inclusive, there was no earned surplus account. Instead, the stockholders' accounts were set up on the liability side of the balance sheet. The balance sheets showed the following condition at the end of each year 1913 to 1917, inclusive: Assets as of December 31 of each year Current
1913
1914
1915
1916
1917
Cash
$ 224.90
$ 652.19
$ 3,769.80
$ 8,273.37
$ 1,497.26
Accounts and Bills Rec
78,269.31
73,126.49
81,481.78
87,885.67
96,147.44
Goods Consigned
842.89
794.22
777.42
821.01
744.84
Inventory
119,212.70
128,151.94
140,328.21
166,673.38
306,051.91
Liberty Bonds
25,000.00
Totals
$198,549.80
$202,724.84
$226,357.21
$263,653.43
$429,441.45
Fixed
Totals
8,952.90
8,852.46
8,330.99
7,427.62
7,962.20
Deferred
Totals
1,000.00
1,000.00
3,000.00
1,500.00
Totals
$208,502.70
$212,577.30
$237,688.20
$272,581.05
$437,403.65
Liabilities, Private Ledger Accounts *443 and Capital Current
1913
1914
1915
1916
1917
Accounts Pay. & Oper. Exp.
$ 12,273.03
$ 8,114.17
$ 18,786.95
$ 21,215.82
$ 37,788.73
Notes Payable
16,000.00
20,000.00
25,000.00
50,000.00
War Orders
12,091.40
Liberty Bonds
18,028.55
Total balances of Stockhold-
ers' Accounts
130,229.67
134,463.13
143,901.25
201,365.23
269,494.97
Capital Stock
50,000.00
50,000.00
50,000.00
50,000.00
50,000.00
Totals
$208,502.70
$212,577.30
$237,688.20
$272,581.05
$437,403.65
On September 8, 1942, some of the stockholders filed with the collector's office form 899, Certificate of Assessments and Payments, with respect to income tax assessed for certain years from 1913 to 1917 inclusive. These reports show that income taxes were paid by some of the stockholders for all or some of the years 1913 to 1917, inclusive. Where income tax returns were filed, the amounts of credits of net profits were reported in the income tax returns as dividends received. The directors of the company, by resolution dated January 15, 1919, authorized the crediting of the stockholders' accounts with their respective proportionate shares of the company's net profits *444 for the year 1918, in the amount of $101,258.92. In the latter part of 1918 or the early part of 1919, an entry was made as of December 31, 1917, in the company's books. This entry transferred the aggregate balances of the stockholders' accounts in the amount of $269,046.24 to an account called "paid-in surplus." The balance, so transferred, was charged against the stockholders' accounts in proportion to their stockholdings. The proportion of the balance in each stockholder's individual account to the aggregate total of the balances of all of the stockholders' accounts varied from and was not the same as each stockholder's proportionate ownership of the total stock. Credits of the net profits for the year 1918 were. transferred from the stockholders' accounts to the profit and loss account for that year by an entry of December 31, 1918. The explanation given for making these entries was that the company had decided to readjust its accounts so that they would reflect the real condition of its affairs as a corporation rather than as a "private holding" (company). The explanation given for the transfer of the stockholders' accounts to the "paid-in surplus" account was that the officers *445 of the company wanted the books to show their actual intentions in that the credit balances of the stockholders' accounts were really capital used in the business. The directors of the company, by a resolution dated January 5, 1920, authorized the above transfers of credits from the stockholders' accounts to the "paid-in surplus" account. The January 15, 1919, and directed transfers of the credits which had been made to the stockholders' accounts to the "surplus account" instead. The resolution also ratified and approved the above-mentioned adjusting entries. The company in its return for the year 1917 in Schedule A reported the sum of $201,356.23 resolution also rescinded the resolution dated as "earned surplus." That amount was the balance of the stockholders' accounts as of December 31, 1916. The company in this return deducted the amount of $15,000 for officers' salaries and $7,200 for rent. The company reported total liability for income and excess profits taxes for the year 1917 in the sum of $23,710.16. The company in its return for the year 1918 reported the balance of the stockholders' accounts as of December 31, 1917, in the amount of $269,046.24, as earned surplus and *446 undivided profits. Both returns treated the sum of $111,454.35 as earned surplus or undivided profits for the year 1913. Schedule A 13, a part of the return for 1918, stated that the officers of the company, Geo. Lawrence, Sr., decedent, and W. C. Lawrence, had each received a compensation of $5,000 for the year 1917. The schedule also had the following notation: "Salaries for previous years were nominal only as all stock held in family and business while legally a corporation had been regarded in every way as a partnership." The company, in its return for the year 1919, reported the amount of $269,046.24 as paid-in surplus, and reported $79,907.50 as earned surplus and undivided profits. Each of the returns were sworn to by George 1 awrence, Sr., and by the decedent as president and treasurer of the company. During the years 1918 to 1937, inclusive, the total net profits and earnings of the company, after deducting all losses of the same period, were in the amount of $81,007.88. The net profits for the taxable year were in the amount of $5,083.84. During the same period, the only dividends declared and paid by the company were as follows: $25,000 in 1935; $25,000 in 1936; and $50,000 *447 in 1937. Decedent received the amount of $17,505 during the taxable year as his share of the dividends paid in 1937. He treated $6,648.40 thereof as a distribution from paid-in surplus upon the theory that only the net amount of $10,856.60 represented a distribution of profits accumulated since February 28, 1913. He reported only $10,856.60 as a taxable distribution. Respondent determined that the total amount of the dividend received by decedent during the year 1937 was taxable. All of the dividend received by decedent during the taxable year in the amount of $17,505 was paid by the company out of its earnings or profits accumulated after February 28, 1913. Opinion The question at issue is whether the entire amount of $17,505 which petitioners' decedent received from the company during the taxable year constituted a dividend under section 115 (a) (1) of the Revenue Act of 1936. [4] The total amount distributed by the company in the taxable year to all of its stockholders was $50,000, including the distributions to the decedent. Petitioners contend that 37.98 percent of the total amount distributed by the company, or $18,992.12, was out of capital or paid-in surplus, and was not *448 out of earnings and profits, and, accordingly, that 37.98 percent of the sum which was distributed to the decedent, or $6,648.40, was distributed out of paid-in surplus. The respondent rejected this view, in determining the deficiency, and added $6,648.40 to taxable income. *449 Petitioners' contentions are found upon the following theory of what disposition was made of the company's earnings: From 1918 to 1937, inclusive, the total of all distributions made by the company was $100,000. During the same period total earnings was $81,007.88, or $18,992.12, less than the total distributions. Petitioners contend that the source of the latter amount was paid-in capital. They say that this is true, because they contend that all of the earnings of the company for the years prior to 1918 had been distributed to the stockholders through the credits which were made to their accounts. If this contention is incorrect, petitioners will fail in this proceeding. The question turns on whether or not the earnings of the company for the years prior to 1918 were distributed to and received by the stockholders. The substance of petitioners' contention is that the crediting of profits to the accounts of the individual stockholders constituted distributions of profits. Petitioners cite ; ; and . *450 The facts show that, although a practice was followed of making credits to the accounts of the stockholders, pursuant to resolutions declaring dividends, the stockholders, for the most part, did not actually withdraw all of the total sum credited to them. In fact, in 1917, prior to the alleged contribution to capital by the stockholders, as of December 31, 1917, there were substantial balances in these accounts. Petitioners do not deny that there was no actual distribution to the stockholders prior to January 1, 1918, of all of the credits. Petitioners' theory involves application of the doctrine of constructive receipt. In the usual situation where the doctrine of constructive receipt may be applied, properly, a solvent debtor who is able to pay money, has credited funds to and made them available to another, and such person has unrestricted control over the funds, and full right to withdraw them. . Whether an item is subject to a taxpayer's demand without qualification or reservation is usually a question of fact. . Upon due consideration, it must *451 be concluded that the doctrine of constructive receipt may not be invoked here; that the stockholders did not receive the earnings of the company during the years prior to 1918, which were credited to them, exclusive of the amounts actually withdrawn, under the doctrine of constructive receipt. Many factors lead to this conclusion; the relationship of the stockholders, the way in which the business was conducted, and the cash position of the business. It is extremely doubtful whether the individual stockholders had full control over the funds credited to the accounts which stood in their names, and the unfettered right to withdraw any and all sums credited thereto. The corporation was not only a close, family corporation, but it was dominated and directed by the father. All of the members of the family concurred implicitly in the father's judgment and wishes. Thus, the father's wishes were respected in the matter of making withdrawals from these accounts. M. H. Lawrence testified that she adhered to her father's wishes in not drawing more than approximately $100 a month. W. C. Lawrence testified that he drew out only what was absolutely necessary to live on, and that he always asked *452 for permission to withdraw any large amount. The cash position of the company was weak. There is considerable doubt whether it was in a position to pay the full amounts credited to the stockholders' accounts at all and at any time. Although the cash position of the company is not determinative [5], it must be considered in examining the company's ability to pay the sums credited to the stockholders' accounts. The company's cash position throughout these years was quite low. All available cash was needed to carry on the business. The company could not have paid out the total balances of the stockholders' accounts without practically liquidating the business. It seems unlikely that banks and other creditors of the company considered these "accounts payable", to the stockholders, as having the same status as other indebtedness of the company for which it was fully liable. Also it seems doubtful whether the company could have borrowed sums to pay the balances standing to the credit of the stockholders in their accounts, in view of the general financial condition of the company. It had not been accumulating earnings in an "earned surplus" account. It had been allocating practically all *453 of net earnings to the stockholders without ever making reserves for Federal taxes. From both a business and an accounting viewpoint, this was not good practice. Petitioner has failed to show that the company was in a financial position to pay the credits in the respective years. Much in the evidence indicates that the business of the company was conducted as a partnership, despite the corporate form. It is customary in the conduct of a partnership to credit the partners with their proportionate shares of profits each year. On the other hand, the earnings of a corporation are not distributable to stockholders unless dividends are validly declared. In reality much of petitioners' problem here is the result of the practice in the early years of conducting the business as a family partnership. The entire situation is such that it is more reasonable to conclude *454 that the "accounts payable" to the stockholders were hybrid in their true function. They served to facilitate distributions to the members of the family, if, as, and when needed, and they also served to keep earnings in the business. In other words, for present purposes, it is closer to reality to say that these "accounts payable" did not constitute true liabilities of the company, because it was not intended that the entire balances would be withdrawn. Rather it apparently was understood that large amounts of the credits would be left in the business. Such understanding is borne out by what was done, and is diametrically opposed to and in conflict with petitioners' theory that the stockholders received "constructively" all of the amounts credited to them. For that matter, in its income tax return for the year 1917, the company reported "earned surplus" in the amount of $201,356.23 which was the same amount as the total balances in the stockholders' accounts as of December 31, 1916. This return was made under oath, of course. It casts doubt on the matter of whether petitioners have at all times considered that there was any constructive receipt of the credits, and indicates that they *455 always regarded the balances in their separate accounts as money left in the business. Petitioners argue that the stockholders, after constructively receiving the earnings which had been credited to them through 1917, made contributions to the capital of the company of the total balances in their accounts. Here, again, the manner in which the balances were transferred to paid-in surplus leaves room for doubt on the point of whether this amounted to a payment into the capital of the company of any funds which had ever been paid out previously, under any theory. On January 5, 1920, at a special meeting of the directors, the adjusting entries which had been made on the books as of December 31, 1917, were ratified retroactively. The resolution contains this explanation: Whereas, such sums were not withdrawn from the business by the individual stockholders but allowed to remain as working capital for the use and benefits of such corporation. This is strong evidence that the stockholders' accounts in reality were accumulations of earnings and constituted earned surplus. From all of the evidence it is concluded that the amount of the 1937 distribution which is in question, to wit, $18,992.12, *456 was paid out of earnings accumulated after February 28, 1913, and therefore, were dividends within the definition of section 115 (a). It is not controlling that the bookkeeping adjustments which were made as of December 31, 1917, transferred the credits to "paid-in surplus." Despite the label which the officers of the company used, the transfers or bookkeeping adjustments constituted, in reality, the setting up of an earned surplus account. It is pointed out, also, that no written instruments were executed by the stockholders in connection with the adjustments. Also, the following must be given consideration: The company in its return for the year 1917 deducted the amount of $15,000 for salaries of officers and the amount of $7,200 for rent. Accordingly, it obtained a tax benefit for deductions for accrued expenses in the amount of $22,200. The accounts of the three stockholders, who were officers of the company, were each credited with the amount of $5,000 for salary and the father's account was credited with the amount of $7,200 for rent for the year 1917. However, there is no evidence that these stockholders ever drew out such amounts. It is now a settled rule that where a taxpayer *457 has taken deductions for accrued obligations and has obtained thereby a tax benefit, the subsequent cancellation of such accrued obligations is income to the taxpayer in the year when the obligations are extinguished. cert. denied, ; ; ; and . When, under petitioners' theory, the stockholders contributed the balances of their accounts to paid-in surplus in 1917, they, in effect, relinquished their rights to receive the $22,200 as salary and rent. That resulted in income to the company. It follows that the company was not in fact deficient in earned income in the amount of $18,992.12, because of income so realized, at the end of 1917, in the amount of $22,200. Therefore, as respondent determined that the total dividend received by decedent during the taxable year was from accrued earnings or profits, it must be presumed that the credits *458 for salary and rent were a part of the total balance of credits to the stockholders which were extinguished by transferring them to the so-called "paid-in surplus" account. Thus, the amount of $22,200 out of the sum of $269,046.24 transferred under the adjustments was clearly income to the company. Two presumptions exist here which petitioners must overcome; the presumption of the correctness of respondent's determination, and the statutory presumption that dividends are paid to the extent thereof out of the most recently accumulated earnings or profits. Petitioner has failed to overcome both presumptions. It is held that the total dividend paid by the company during the taxable year was paid out of earnings or profits accumulated after February 28, 1913, and that the entire amount of $17,505 received by decedent during the taxable year constitutes a taxable dividend. Decision will be entered for the respondent. Footnotes
1. A credit of $448.73 to the account of R. D. Lawrence was also included in the private ledger balances. Exclusive of this item the balance of all the accounts was $269,046.24.↩
2. Includes the sum of $34,200 credited as gifts to other stockholders. ↩
3. Includes the retirement of a beginning deficit of $8,787.92 which was finally retired in the year 1917.↩
4. SEC. 115. Distributions by Corporations. - (a) Definition of Dividend. - The term "dividend" when used in this title (except in section 203 (a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distribution made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. (b) Source of Distributions. - ↩ For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113.
5. . The corporation carried on a family investment business; cash was invested in securities; . The corporation had a large surplus after deducting all previously declared dividends.↩